UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MATTHEW CALICCHIO, SANDRA CALICCHIO,
and MICHAEL CALICCHIO,

                      Plaintiffs,

      -against-

SACHEM CENTRAL SCHOOL DISTRICT, LISA
JOHNSON, JOHN DOLAN, ANDREW LARSEN,
JACK RENDA, KAREN MOTT, and JOHN DOES
number 1-15.[1]

                 Defendants.
-------------------------------------------------------------X

**MEMORANDUM & ORDER**
14-CV-5958 (DRH) (SIL)

**APPEARANCES:**

**SCOTT LOCKWOOD, ESQ.**
Attorney for Plaintiffs
1476 Deer Park Ave.
Suite 3
North Babylon, New York 11703

**DEVITT SPELLMAN BARRETT, LLP**
Attorneys for Defendants Sachem Central School District,
   Lisa Johnson, John Dolan, Andrew Larsen, Jack Renda,
   and Karen Mott
50 Route 111
Smithtown, New York 11787
By:   Felicia Gross, Esq.

**HURLEY, Senior District Judge:**

     Plaintiffs Matthew Calicchio ("Matthew" or "Plaintiff"), Sandra Calicchio

("Sandra") and Michael Calicchio ("Michael") (Sandra and Michael are jointly

---

[1] By Order dated May 5, 2016 , the Court granted the motion of the County of Suffolk and the
County of Suffolk Police Department to dismiss the claim against them and, accordingly, the caption
is hereby amended to reflect that dismissal.

referred to as "Parents") commenced this action against defendants Sachem Central School District (the "District"), Lisa Johnson ("Johnson"), John Dolan ("Dolan"), Andrew Larsen ("Larsen"), Jack Renda ("Renda"), Karen Mott ("Mott") (Johnson, Dolan, Larsen, Renda, and Mott are collectively referred to as "Individual Defendants") ( District and Individual Defendants together "Defendants") asserting various federal and state claims, some of which were previously dismissed.[2] Currently before the Court is Defendants' motion for summary judgment on the remaining claims. For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

### I. The Nature of Plaintiffs' Claims

#### A. The Allegations of the Amended Complaint

Matthew alleges that during the years 2010 through 2013, while he was a student in the district, the Individual Defendants "required" him to perform work for the District consisting of "working on the computer system, the computer network and security for computers. (Amended Complaint ("AC") at ¶¶ 20, 22-23.) Matthew "was repeatedly removed from his classroom learning environment and from his lunch period and was forced [to] perform" this "uncompensated work." Matthew was told by Assistant Principal Larson "that if he did not do the work they

---

[2] By Order dated May 5, 2016, the Court dismissed the following claims in the against the District Defendants: (1) Thirteenth Amendment involuntary servitude (first cause of action); (2) malicious prosecution (fifth and seventh causes of action); (3) intentional infliction of emotional distress as against the District only (eighth cause of action); and (4) negligent infliction of emotional distress (ninth cause of action).

wanted him to do on the computers that he would have him arrested by the FBI, and the FBI would raid his house." Principal Dolan told Matthew that if he did not do the work "they would have him expelled from school." When Matthew stopped working on the District computer, "the Defendants had him expelled from school and had him arrested." (*Id.* at ¶¶ 24-28.) Matthew was forced to perform this work without his parents' permission and in fact Matthew was ordered by the Individual Defendants not to tell his parents about this "forced" work. (*Id.* at ¶¶ 106-07, 112-13.) In November 2013, Matthew who was born on August 10, 1996 and "eligible for compulsory education," was expelled from the District without notice and an opportunity to be heard and was not "afforded an opportunity for a hearing on the continued eligibility of himself for attendance and instruction." (*Id.* at ¶¶ 34, 55-62.) Further, the District caused a knowingly false criminal complaint to be lodged resulting in Matthew being "arrested and charged with the crimes of Computer Trespass and Unlawful Duplication of Computer Material." and reported to various news sources that Matthew "had 'illegally accessed student records,' had 'hacked into' the computer system, and committed an act of 'computer trespass.'" (*Id.* at ¶ 65-67, 78.)

### B. The Causes of Action Which Remain

The following claims currently remain pending against Defendants: (1) the second cause of action for violation of the oppressive child labor provision of Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(1); (2) the third cause of action for violation of the FLSA's minimum wage provision, 29 U.S.C. § 206; (3) the fourth

cause of action alleging violation of New York State's compulsory education law and the Due Process Clause of the Fourteenth Amendment (*Monell* claim); (4) the sixth cause of action for slander per se; (5) the seventh cause of action for false arrest (6) the eighth cause of action for intentional infliction of emotional distress against the Individual Defendants only; (7) the tenth cause of action for unlawful detention; (8) the eleventh cause of action for violation of Article IV of the New York State Labor Law; (9) the thirteen cause of action for Michael's "loss of parental liberty;" and (10) the fourteenth cause of action for Sandra's "loss of parental liberty."

## II.     Uncontested Material Facts Presented on the Instant Motion

The following facts are taken from the parties' 56.1 statements and are undisputed unless otherwise noted.

### A.     The Players

Matthew, who was born in August 1996 was at student at Sachem North High School ("North") in the District from at least 2010 through 2013. His parents are Sandra and Michael; they separated in 2008. (Pls.' 56.1 Resp. ¶¶ 9-12.)

Dolan was employed by the District as principal at North from 2010 to 2015. Johnson and Larsen were assistant principals at North during the relevant time period; Renda was the administrative assistant for instructional technology at North and Mott was a communication aide in the technology department. (*Id.* at ¶¶ 4-8.)

**B. Matthew's Attendance and Disciplinary Record**

      1.   The 2010-2011 School Year

Beginning in the 2010-2011 school year, when he was in ninth grade, Matthew had attendance issues which he claims were related to a medical condition, irritable bowel syndrome. The attendance issues continued throughout that school year. (*Id.* at ¶¶ 14-16.)

In October 2010, Matthew's business teacher alerted Larsen that he suspected Matthew of accessing restricted information through the school's computers. The IT department confirmed that Matthew accessed, using the school's computer, areas the District deemed restricted by comparing Matthew's student log-in with the login of the unauthorized user. As a result, Matthew was issued a two-day in school suspension, which suspension Matthew claims was later rescinded by the school. Larsen sent a letter to Sandra and left her a message about the suspension but received no call back and no meeting took place. In November 2010, Renda alerted Dolan, Larsen, and Mott via email that Matthew was again flagged by the IT Department alerting software based on his trying to access areas the District deemed restricted. Mott responded that "Matt has been working with me and Rob to see what areas he still has access to . . . of course he was working in our presence if he is still doing this on his own." The District's IT department placed a block on Matthew's account, which was subsequently removed in May 2011. (*Id.* at ¶¶ 18-24.)

In the fall of 2010 Matthew asked Larsen to write him a letter of recommendation to assist him in getting an outside job. In response, Larsen wrote a letter "to whom it may concern" stating as follows:

> I am the Assistant Principal at Sachem High School North and have had the pleasure of working with Matthew Calicchio this year. Matthew is a bright young man who has extraordinary computer skills for his age. Matthew has been an asset to our IT department and is learning the importance of working with a team. Matthew has been able to pinpoint areas of weakness in our local area network and offer solutions to the various problems he has come across. What I am most impressed with is Matthew's ability to keep all information confidential, which proves he is a trustworthy individual. Also, he absorbs any computer related information at a rate approximately twice the rate of his fellow classmates. Matthew has extensive skills in Microsoft Office and has the ability to learn new programs upon request. These qualities, among many others, will make Matthew an excellent employee with your company.
> Thank you for considering Matthew as an employee with your company and please feel free to contact me at your convenience.

(*Id.* at ¶ 27; Ex. H to Lockwood Decl.)

      2.    <u>The 2011-2012 School Year</u>

Matthew continued to have attendance issues during tenth grade, the 2011-2012 school year. The dean of students sent letters to his parents on October 31, 2011, November 2, 2011, November 16, 2011, December 16, 2011, March 13, 2012 and March 30, 2012 stating that Matthew would be denied credit for his courses because of absenteeism and that his graduation might be jeopardized. (Pls.' 56.1 Resp. ¶¶ 37-38.)

      3.    <u>The 2012-2013 School Year</u>

Matthew's attendance problem did not abate in the 2012-2013 school year. He was not on track to graduate, as he only had enough credits to be considered a

tenth grader. On October 25, 2012, the Dean of Students sent Sandra two letters stating that Matthew was being denied credit for all his classes. On January 10, 2013, Johnson sent Matthew's parents a letter advising them of a phone conference to discuss Matthew's academic performance. (*Id.* at ¶ 50.)

Matthew was given one-day, in-school suspensions on September 28, 2012, October 26, 2012, November 27, 2012, April 10, 2013, and April 11, 2013 for cutting class, speaking inappropriately to a staff member, insubordination, cutting class and insubordination and being disruptive, respectively. A letter was sent on November 21, 2012 to Matthew's parents explaining that the school had made several phone calls to their home in unsuccessful attempts to reach them and requesting that the parents contact the school as soon as possible. On December 21, 2012 Dolan sent a certified letter to Matthew's parents requesting they contact the school regarding Matthew's behavior. (*Id.* at ¶¶ 44-49, 51-52.)

4. The 2013-2014 School Year

In the 2013-2014 school year, which should have his senior year, Matthew continued to have attendance issues and was not on track to graduate as he only had enough credits to be considered a tenth grader. According to the District, Matthew was absent for twenty (20) consecutive days in September and October 2013, a fact that Matthew disputes. In September 2013, the assistant principal who handled attendance and discipline issues for the senior class scheduled an in-person conference with Matthew and his mother to be held on September 25, 2013. Sandra failed to appear for the meeting. (*Id.* at ¶¶ 61, 62, 64.)

On October 22, 2013, that assistant principle, together with Dolan, sent a letter to Sandra stating: "In view of the fact that your son, Matthew Calicchio, has been absent from school 20 consecutive days since the start of school, I have no recourse but to remove Matthew from the rolls of Sachem High School North." (*Id.* at ¶ 66.)

Matthew did not attend class in the District after being dropped from the rolls. In 2013, he received his General Education Development (GED) certificate from Suffolk Community College. (*Id.* at 68-69.)

## C.    Matthew and the District's Computers

The facts surround Matthew and the District's computers are disputed. Set forth below is the District's version, following which is Matthew's.

### 1.    According to the District

Around the time of his suspension in November 2010, Matthew told Larsen that he had information he would like passed onto the IT Department regarding the security of the school's computers and requested to meet with the IT Department multiple times. Specifically, Matthew wanted to "help tighten up security" and "help [the IT Department] understand how he was doing things." IT Department staff member Mott met with Matthew in the main office at North once or twice. Matthew was introduced to Mott by Dolan who said "[t]his Matt. He has some computer concerns he would like to make you aware of." Since Matthew had reported there were "holes in the security system", Dolan "asked him to kind of prove [it] to us[] and he never seemed to be able to prove anything." Matthew sat with computer

techs and they would ask Matthew to show them what he was referencing. According to Dolan, on a regular basis Matthew would claim things that were never substantiated. (Defs.' 56.1 ¶¶ 29-36.)

During the 2012-13 school year, Matthew continued to go to Dolan's office to express concerns with the schools' (computer) security system. Mott asked Matthew to put his concerns on paper and he did so. She then scanned the paperwork and sent it to the IT Department. Thereafter Matthew would "occasionally pop[] into the office with concerns." For example, he came to the IT Department and informed them that he could see the East[3] student folders. In or around November 13, 2012, members of the IT department had a 20-minute meeting with Matthew during which Mott set him up on a computer terminal with the IT Department remoting into that computer so that they were able to watch what Matthew was doing. At no time was Matthew authorized to work with the IT Department. (*Id.* at ¶¶ 53-60.)

2.    <u>According to Matthew</u>

According to Matthew's 50-h testimony, his suspension in the Fall of 2010 (while he was in ninth grade) was rescinded after it was determined that he did not do anything wrong. Following this, Matthew was asked, on numerous occasions at the request of administrators, to prepare documents relating to the district's network security. These requests were made by in the 2010-2011, 2011-2012, and 2012-2013 school years by Larsen, Dolan and Johnson. (June 24, 2014 Exam of Matthew ("50-h Exam.") at 18-21.)

---

[3] East is another high school in the District.

As a result, the District discovered "that their network was vulnerable," and Matthew was told "to write an assessment of these vulnerabilities." In the 2010-2011 school year it was Dolan and Larsen who told him to do this "plenty of times." When this would occur, Matthew would be asked to leave his regular class and come to the office. He would then be advised to go to the school's technical department where he would be placed in touch with either Renda or Mott. He was told to "assist them." He estimated this occurred approximately twenty or thirty times the first year. This did not occur solely in the ninth grade. He was taken out of classes to do this work, "whenever they needed me. If, you know, Ms. Mott was available during fourth period, they would call me out of math or whatever it was." He would be paged over the intercom and phone units, he would be ordered to report during a certain period, or to get a pass from a teacher. He would then work on the computer system with the IT Department. This continued during tenth and eleventh grades. He spent "multiple hours" doing this (*Id*. 24- 33).

While he was doing this work, the IT Department would, at times, allow him to use the administrator credentials to perform these tasks. Indeed, Matthew was even given an administrator account at one point. He and the IT Department were working towards solving the problems with the computers. They were able to fix most of the problems. One of the significant concerns was the fact that the school was unable to protect confidential student records. (*Id*. at 51, 69-71).

Matthew would give reports to the administrators, usually either Larsen or Mott. He gave many of these reports to them. Although there were a number of

them, only one report appears to have survived and provides an example the work Matthew was doing with the IT Department. (*Id.* at 34-50, 69.) These reports remained in the possession of the school district (March 17, 2017 Dep. of Matthew at 53-57.)

According to Matthew, the work he was being forced to do "had often interfered with [his] schoolwork which made it very hard to - to complete the activities that were assigned to [him]." He advised Dolan that it was affecting his schoolwork. He noted on several occasions to Mott that he did not wish to do this. He also complained about this to both Dolan and Larsen. (June 24, 2014 Dep. of Matthew at 52-54, 59, 64-65.)

When he was told to attend a meeting with the IT Department, he was advised that he would be considered "truant" if he did not attend. He was further advised that if he did not comply, it would be a violation of the student handbook for willfully disobeying an administrator and he could be suspended. He did not receive any credit for this work, and he was not aware of any other students being forced to do this work. In addition, Mott and Dolan told him he was not allowed to leave until the work was done, not even for lunch or to go to the restroom. (*Id.* at 54; 55-56, 57, 93-96).

3.   The Criminal Proceedings

On November 8, 2013, the District discovered that a large amount of student records had been expropriated from its proprietary computer system and posted on a public website. The student records posted contained medical histories,

transcripts, report card grades, attendance records, and disciplinary records. On November 9, 2013, District staff made a written complaint to the FBI. Thereafter, IT Department staff cooperated with the authorities, including the Suffolk County Police Department.

On November 22, 2013, Matthew was arrested by the Suffolk County Police Department and indicted on two counts of Computer Trespass (Class E Felony) in violation of New York Penal Law Section 156.10(1) and one count of Unlawful Duplication of Computer Related Material in the First Degree (Class E Felony) in violation of New York Penal Law Section 156.30(2). Matthew signed a waiver of rights form and gave a written statement that included the following:

> In Feb[ruary] 2011[,] I was at Sachem North. It was my first year. I was on a school computer and noticed I could open folders on the school system that were supposed to be restricted. I notified my school administration who put me in contact with IT people. I showed them a short cut to a directory that got me to higher directory without privileges. They couldn't fix it so it stayed that way over a period of time. From Feb[ruary] 2011 thru [sic] the school year last year[,] I would use the school computers at Sachem North to test their system and sometimes find open information on various system folders that contained all kinds of stuff including student information. Sometime in 2011 I began penetration testing and found some small log files and transferred [them] out over the internet to a file share site. I don't remember exactly which one. Sometime at the end of the school year in 2011 or the beginning 2012 school years I had been testing the system for vulnerabilities and found some data – IES. It's all over the place. I downloaded it to a USB. A while later I noticed there was student data in there. This goes on for all of the 2012-2013 and I would sweep up data and sometimes get student data accidently. I would do that occasionally and the last time I did it was in June 2013. About a month after I was looking at what I got from the penetration and I noticed the files that I got contained serious information. Some of it had social security numbers, some medical stuff, DTS, lunch list, the free lunch list, some student pictures, addresses that were never posted. In July 2013 I wanted to make sure the school followed proper policy and

offered credit protection & followed all proper procedures referencing my personal information. There was a site called Sachemunspun.com which is a community board. A place where people can share information. So out of concern and to point out that peoples' personal information could be comprised I posted a list of names, just names, that's all. I also sent the top administrator an email link to [that] list just to show people should be concerned. In August I posted or shared more of the information I had. [In] November 2013[,] I started establishing web sites at a website call iapps.com which is primarily a blog site. I established a site sachem.iapps.com in the domain name and on there I would post link to files, images, [unintelligible] files that had data in it. Mainly images, some censored. . . . Det[ective] Forrester showed me some of the printouts obtained from Sachemiapp.com and these are the ones I had accessed at the school. . . . .

Ex. Q to Gross Declar. at DEF 10000005-10000008.

On November 5, 2014 Matthew pled guilty to one count of unlawful duplication of computer related material in the first degree (Class E Felony) in violation of New York Penal Law § 156.30(2) with the understanding that if he completed probation, the charge would be reduced to unlawful duplication of computer related material in the second degree, a Class B misdemeanor. Between October 2014 and November 2015 Matthew successfully completed probation. On November 12, 2015, at a second plea hearing and sentencing, the court vacated Matthew's prior guilty plea and Matthew pled guilty to the Class B misdemeanor of unlawful duplication of computer related material in the second degree. He was sentenced to a mandatory surcharge of $200 and a conditional discharge.

## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment, pursuant to Rule 56, is appropriate only where the movant "shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When making this determination, a court must view all facts "in the light most favorable" to the non-movant, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), and "resolve all ambiguities and draw all permissible factual inferences in favor of the [non-movant]," *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). Thus, "[s]ummary judgment is appropriate [only] where the record taken as a whole could not lead a rational trier of fact to find for the [non-movant]." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (internal quotation marks omitted).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts demonstrating that there is a genuine dispute of material fact to be tried. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The non-movant must present more than a "scintilla of evidence," *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita*, 475 U.S. at 586-87), and "may not rely on conclusory

allegations or unsubstantiated speculation," *Id.* (quoting *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination[s] of summary judgment motions," *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the [non-movant] will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by pointing to an absence of evidence to support an essential element of the [non-movant's] case." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (quoting *Brady*, 863 F.2d at 210-11) (internal quotation marks omitted). Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). "[A] complete failure of proof concerning an essential element of the [non-movant's] case necessarily renders all other facts immaterial." *Crawford*, 758 F.3d at 486 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II. Matthew's FLSA Claims

In his second and third causes of action Matthew asserts violations of the FLSA.

Defendants maintain that they are entitled to judgment on Matthew's causes of action under the FLSA, 29 U.S.C. §§ 203 and 206 as he has failed to present evidence that he was an "employee" and his criminal conviction estops him from claiming otherwise.

## A.     Whether Matthew was an Employee

Section 203(1) of the FLSA provides:

> Oppressive child labor means a condition of employment under which (1) any employee under the age of sixteen years is employed by an employer (other than a parent or a person standing in place of a parent employing his own child or a child in his custody under the age of sixteen years in an occupation other than manufacturing or mining or an occupation found by the Secretary of Labor to be particularly hazardous for the employment of children between the ages of sixteen and eighteen years or detrimental to their health or well-being) in any occupation, or (2) any employee between the ages of sixteen and eighteen years is employed by an employer in any occupation which the Secretary of Labor shall find and by order declare to be particularly hazardous for the employment of children between such ages or detrimental to their health or well-being; but oppressive child labor shall not be deemed to exist by virtue of the employment in any occupation of any person with respect to whom the employer shall have on file an unexpired certificate issued and held pursuant to regulations of the Secretary of Labor certifying that such person is above the oppressive child-labor age. The Secretary of Labor shall provide by regulation or by order that the employment of employees between the ages of fourteen and sixteen years in occupations other than manufacturing and mining shall not be deemed to constitute oppressive child labor if and to the extent that the Secretary of Labor determines that such employment is confined to periods which will not interfere with their schooling and to conditions which will not interfere with their health and well-being.

29 U.S.C. § 203(l).  Section 212(c) provides that "[n]o employer shall employ any oppressive child labor in commerce or in the production of goods for commerce or in

any enterprise engaged in commerce or in the production of goods for commerce."

Id. at §212(c).

With respect to minimum wage, the FLSA provides that

[e]very employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, wages at the following rates: (1) except as otherwise provided in this section, not less than—(A) $5.85 an hour, beginning on the 60th day after May 25, 2007; (B) $6.55 an hour, beginning 12 months after that 60th day; and (C) $7.25 an hour, beginning 24 months after that 60th day.

29 U.S.C. § 206(a)(1).

Both statutes apply only to "employees." The FLSA unhelpfully defines "employee" as an "individual employed by an employer." 29 U.S.C. § 203(e)(1). "Employ" is defined as "to suffer or permit to work." Id. § 203(g). "The standard for 'employee' is broad, but the Supreme Court has long recognized that not every individual who performs a service for an employer qualifies as an 'employee' under the FLSA. '[E]mployee' status depends upon the 'economic reality' of the relationship between the putative employer and employee." *Wang v. Hearst Corporation*, 877 F.3d 69, 72 (2d Cir. 2017) (citing *Walling v. Portland Terminal Co.*, 330 U.S. 148, 149-53, (1947) and *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 534, 536 (2d Cir. 2016)).

Defendants maintain the claim that Matthew was an employee must be dismissed because "there was no employment agreement between Matthew and the District;" "[t]here is no evidence other than Matthew's bare assertion[s], that he was an 'employee' of the District," "was formally hired, had set hours, or had an official

supervisor." Also, as the "District retained an outside company to perform network security . . . it derived no benefit from the alleged 'work' performed by Plaintiff." (Defs.' Mem. in Supp. at 13.) However, as Plaintiff points out, there is no requirement of an employment agreement, set hours, official supervisor, or having been formally hired.

Similarly, Defendants reliance on *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 524 is unavailing as there is no evidence that the work Matthew claims to have performed was part of a training or learning program.

Here, given that the parties' versions of the facts are diametrically opposed, it is not appropriate for this Court to rule as a matter of law on the issue of whether Matthew was an employee of the District. *See generally, Wang*, 877 F.3d at 76 (a district court may rule on the issue of "employee" if it can weigh the *Glatt* factors on the basis of facts that are not in dispute). According to Defendants, Matthew "volunteered" his computer expertise. Matthew, on the other hand, contends he was required to work on the District's computers. Which version prevails, must await trial.

**B.     Whether Matthew is Estopped from Claiming He was an Employee By Virtue of the Criminal Proceedings**

Defendants' argument regarding the estoppel effect of the criminal proceedings is twofold. First, in his written statement he admitted that "he used the school's computers to further his own interest in exposing student data." Second, "the District's permission or compulsion by the District would have been a defense to the crime to which Matthew pled guilty." Neither argument is persuasive.

While Matthew was charged with two counts of Computer Trespass (Class E Felony) in violation of New York Penal Law Section 156.10(1), he did not plead guilty to those counts. Rather, both his original (vacated) and later plea were to "Unlawful Duplication of Computer Related Material" which requires that the charged individual "having no right to do so," "copies, reproduces or duplicates in any manner computer material . . . ."  In other words, it is the copying or duplication without right that forms the basis for the crime. Contrary to Defendants' intimation otherwise, it does not require one to have accessed the computer material without the right to do so.[4] Therefore, the District's permission to access the materials would not provide a defense to the count of conviction.

Turning to Matthew's written statement, it does not provide a basis for estoppel. Indeed, Matthew stated therein that he used the school's computers to test their system, which is consistent with his claims in this action. While a jury may ultimately determine that his failure to explicitly state that he used the District's computers at their insistence undermines his claim, it does not warrant summary judgment in the District's favor on estoppel grounds.

## III.    Matthew's Due Process Claim

Matthew's fourth cause of action asserts a violation of his Due Process rights under the Fourteenth Amendment when it expelled him in November 2013 without

---

[4] "'[U]nauthorized use of a computer' [Penal Law § 156.05] and 'computer trespass' [Penal Law § 156.10] have common elements, one of which is that the operator of the computer act 'without authorization.' An operator who uses a computer to commit a crime is not by that fact alone deemed to have acted 'without authorization.' Thus, the operator of a computer who accesses the computer with permission, but then uses it to commit a crime is not criminally liable for these crimes. N.Y Penal Law § 156.00 McKinney's Supplemental Practice Commentaries (citing *People v. Golb*, 23 N.Y.3d 455, 991 N.Y.S.2d 792, 15 N.E.3d 805 (2014)).

his first being afforded sufficient notice and an opportunity to be heard based on his continued eligibility for attendance and instruction under New York's compulsory education law.

To prevail on a Due Process claim, a plaintiff must demonstrate that he "has a property interest, created by state law, in . . . the benefit that was removed." *Bernheim v. Litt*, 79 F.3d 318, 322 (2d Cir. 1996). *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005); *Green v. Bauvi*, 46 F.3d 189, 195 (2d Cir. 1995).

New York's education laws, provide in pertinent part, that "[a] person over five and under twenty-one years of age who has not received a high school diploma is entitled to attend the public schools maintained in the district in which such person resides without payment of tuition." N.Y. Educ. Law § 3202(1). The Second Circuit has recognized that section 3202(1) of the New York Education Law "creates a property right in a free public education . . . that may not be taken away without the minimum procedures required by the Due Process Clause." *Kajoshaj v. New York City Dept. of Educ.*, 543 F. App'x 11, 16 (2d Cir. 2013) (citing *Handberry v. Thompson*, 446 F.3d 335, 353 (2d Cir. 2006) and *Goss v. Lopez*, 419 U.S. 565, 574 (1975)). *See Mitchell C. v. Bd. of Educ.*, 67 A.D.2d 284, 288, 414 N.Y.S.2d 923, 926 (2d Dept. 1979) ("[W]here a State or subdivision thereof undertakes to provide a free education to all students, it must recognize an individual student's legitimate entitlement to a public education as a property interest protected by the due process clause . . . ."). The extent of that property interest, however, is circumscribed by other subsections of Education Law § 3202. *See Handberry*, 446 F.3d at 353

(holding that section 3202(7), which governs youths who are incarcerated, does not give rise to the legitimate expectation of the same type of educational benefit that section 3202(1) does).

The statutory procedures for dis-enrolling a student under New York State law are set forth in Section 3202(1-a), which provides in pertinent part:

> No pupil over the compulsory attendance age in his or her school district shall be dropped from enrollment unless he or she has been absent twenty consecutive school days and the following procedure is complied with: The principal or superintendent shall schedule and notify, in writing and at the last known address, both the student and the person in parental relation to the student of an informal conference. At the conference the principal or superintendent shall determine both the reasons for the pupil's absence and whether reasonable changes in the pupil's educational program would encourage and facilitate his or her re-entry or continuance of study. The pupil and the person in parental relation shall be informed orally and in writing of the pupil's right to re-enroll at any time in the public school maintained in the district where he or she resides, if otherwise qualified under this section. If the pupil and the person in parental relationship fail, after reasonable notice, to attend the informal conference, the pupil may be dropped from enrollment provided that he or she and the person in parental relation are notified in writing of the right to re-enter at any time, if otherwise qualified under this section.

N.Y. Educ. Law § 3202(1-a).

Pointing to the lack of evidence that the requirements of § 3202(1-a) were complied with, Matthew argues that the Defendant's motion must be denied. Defendants, on the other hand, maintain that the Due Process clause requires only notice and an opportunity to be heard and does not necessarily require compliance with state procedures and that the notice and opportunity to heard provided by the District was sufficient to satisfy due process.

Defendants are correct that the violation of state law does not in itself violate the Constitution because "federal constitutional standards rather than state law define the requirements of due process." *Holland v. City of New York*, 197 F. Supp. 3d 529, 529 (S.D.N.Y. 2016) (internal quotation marks omitted); *see Rivera v. Illinois*, 556 U.S. 148, 158 (2009) (The Due Process Clause . . . safeguards not the meticulous observance of state procedural prescriptions, but the 'fundamental elements of fairness . . . . ") (internal quotation marks omitted). However, in this case there is no evidence that Matthew himself was provided with any type of notice and opportunity to be heard before he was disenrolled.

With respect to notice to his parents, Defendants argues that "in a letter dated October 22, 2013 from Principal Dolan and Assistant Principal Miller, the District Defendants informed his parents that due to his having 20 consecutive absences, Matthew would be removed from the rolls. He was given notice of the charges (absenteeism) and the consequences (disenrollment). Such a letter did not say that Matthew had already been removed from the rolls." (Defs.' Reply at 11.) With respect to an opportunity to be heard, Defendants rely upon the attempts to set up a meeting with his parents in the prior year and an affidavit of Miller that he called Sandra and scheduled a meeting with her.

With respect to the October 22, 2013 letter, it stated that there was "no recourse but to remove Matthew from the rolls of Sachem High School North." It did not advise that Matthew or parents had an opportunity either to dispute the number of absences or to provide the reasons for the absences. According to Miller's

affidavit, the conference scheduled for September 2013 was to discuss "Matthew's excessive absences and what might be done to get Matthew to comply with the school's attendance policy." (DE 66-3 ¶ 5.) It does not mention the possibility of disenrollment should Matthew continue to be absent. Finally, the letters sent in the prior year refer to Matthew not graduating and do not reference the possibility of his disenrollment. In other words, based on the material presented to the Court, Defendants are not entitled to summary judgment on the Due Process claim.

The District further argues that it there is no evidence to support a claim under *Monell* against it. It is that argument to which the Court now turns.

In order to bring a § 1983 claim against a municipal defendant, a plaintiff must establish both a violation of his constitutional rights and that the violation was motivated by a municipal custom or policy. *See Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978); see *Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 686 (2d Cir. 2005) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."); *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004); *see also Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) (noting that "the mere invocation of the 'pattern' or 'plan' will not suffice") (citations omitted); *Middleton v. City of New York*, 2006 U.S. Dist. Lexis 44320 (E.D.N.Y. 2006) (allegations of an isolated incident of police misconduct will not suffice). A

municipality cannot be held liable under Section 1983 on a respondeat superior theory. *Monell*, 436 U.S. at 691.

"To show a policy, custom, or practice, a plaintiff need not identify an express rule or regulation." *Patterson*, 375 F.3d at 226. "Rather, the existence of a municipal policy or custom may be plead in any of four ways.  A plaintiff may allege "(1) the existence of a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of policymaking officials; or (4) a failure by policy makers to properly train or supervise their subordinates, amounting to deliberate indifference to the rights of those who come in contact with municipal employees."  *Calicchio v. Sachem Central Sch. Dist.*, 2015 WL 5944269, *10 (E.D.N.Y. Oct. 13, 2015) (citing *Giscombe v. New York City Dept. of Educ.*, 2013 WL 829127, * 7 (S.D.N.Y. Feb. 28, 2013); *accord Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 430 (S.D.N.Y.2012)); *Zambrano–Lamhaouhi v. New York City Bd. of Educ.*, 866 F. Supp. 2d 147, 175 (E.D.N.Y.2011).

Defendants argue that there is no evidence that Principal Dolan represents the final decision maker. The Court disagrees.  The letter sent out by Dolan and Larsen states that "In view of the fact that your son, Matthew Calicchio, has been absent from school 20 consecutive days since the start of school, **I** have no recourse but to remove Matthew from the rolls of Sachem High School North." (emphasis

added). This is sufficient to present to the jury the question of whether the alleged violation of plaintiff's civil rights was caused by actions taken by an official with "final decision-making authority." *See Joinnides v. Floral Park-Bellerose Union Free Sch. Dist.*, 2016 WL 3841096 (E.D.N.Y. July 13, 2016) (noting that "district courts in this Circuit have held that a school principal is a final policymaker where 'the ultimate harm that befell the plaintiff was under the principal's control.'" (quoting *Zambrano-Lamhaouhi v. N.Y. City Bd. of Educ.*, 866 F. Supp. 2d 147, 175 (E.D.N.Y. 2011)); *see also Lovell v. Comsewogue Sch. Dist.*, 214 F. Supp. 2d 319, 324 (E.D.N.Y.2002) (to possess authority, a person "need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, she must be 'responsible under state law for making policy in that area of the [municipality's] business.' " (quoting *Jeffes v. Barnes,* 208 F.3d 49, 56 (2d Cir.2000))).

The motion to dismiss the *Monell* claim is denied.

## IV.    The Unlawful Detention Claims

Plaintiff asserts claims for unlawful detention both under § 1983 and under state law.  Both these causes of action require that (1) defendant intended to confine the plaintiff; (2) plaintiff was conscious of the confinement; (3) plaintiff did not consent to the confinement and (4) the confinement was not privileged. *Acevedo v. Ross*, 2019 WL 343246, at *4 (E.D.N.Y. Jan. 28, 2019) (citing *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).

Defendants contend that "the record contains no evidence other than Matthew's bare assertions" that any District employee intended to confine [him]

against his will to work on the school's computers. (Defs.' Mem. at 28.) In fact, the record contains more than bare assertions. Matthew testified under oath, inter alia, that (1) Mott told him he could not go anywhere, not even to get lunch or go to the bathroom until he finished his work; (2) Dolan told him on multiple occasions that he could not leave until the work was finished; (3) he was told that if he left he would be suspended or expelled for disobeying an administrator; and (4) he was forcibly kept in a room. (50-h Exam. at 56-59, 94-96.). This testimony is sufficient to support the first three elements of an unlawful detention claim specified above. Further, the Court rejects Defendants' argument that any such detention was privileged simply because it occurred in an educational institution, as viewing the facts in the light most favorable to Plaintiff, the detention was not tethered to a disciplinary or other educational purpose.

The motion for summary judgment on the unlawful detention claim is denied.

## V.     Intentional Infliction of Emotional Distress

Liability for intentional infliction of emotional distress requires conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Murphy v. Am Home Prod. Corp.*, 58 N.Y.2d 293 (1983). Viewing the evidence in the light most favorable to Matthew, a reasonable trier of fact could conclude that this standard has been met. According to Matthew, he was kept out of class, forced to work on the District's computer, not allowed to go to the bathroom or to lunch while so engaged, and threatened. Such behavior by those charged with the

education and care of a minor, if true, is intolerable in a civilized society. The motion as addressed to this claim is denied.

## VI.     New York Labor Law Clams

Defendants repeats their argument, made in connection with the FLSA claim, that there is no evidence that Matthew was an employee. For the reasons already enunciated with respect to the FLSA claim, the motion or summary judgment on the New York Labor Law claim is denied.

## VII.     Infringement on Parental Liberty

Michael and Sandra have each asserted claims for denial of Substantive Due Process, grounded in the assertion that Defendants deprived them of their right to make independent and informed decisions with respect to the education and upbringing of Matthew by pulling him out of his classes and forcing him to work without recompense or credit and ordering Matthew not to tell them  he was working on the District's computers.

Substantive due process rights safeguard persons "against the government's 'exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against a government action that is incorrect or ill advised." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir.1995) (internal quotation marks omitted). S*ee Lowrance v. Achtyl,* 20 F.3d 529,

537 (2d Cir. 1994). To state a Substantive Due Process claim, plaintiffs must allege (1) a valid liberty or property interest, and (2) defendants infringed on that interest in an arbitrary or irrational manner. *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 503 (2d Cir. 2001); *Natale v. Town of Ridgefield*, 170 F.3d 258, 262 (2d Cir.1999) ("For state action to be taken in violation of the requirements of substantive due process, the denial must have occurred under circumstances warranting the labels 'arbitrary' and 'outrageous.' ").

Included within the protections of the substantive right under the Due Process clause is the right to intimate familial association. *Gorman v. Rensselaer County*, 910 F.3d 40. The parental interest "in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). As the Second Circuit in *McCaul v. Ardsley Union Free School Dist.*, 514 F. App'x 1 (2d Cir. 2013) stated, "[i]t is well settled that parents have 'a constitutionally protected liberty interest in the care, custody and management of their children.'" (citing *Southerland v. City of N.Y.*, 680 F.3d 127, 142 (2d Cir.2011)). However, "a claim under the Due Process Clause for infringement of the right to familial associations requires the allegation that state action was specifically intended to interfere with the family relationship." *Gorman*, 910 F.3d at 48.

Defendants maintain that the second element is absent as the record is "devoid of evidence supporting Matthew's claims that he was forced to work for the District without his parents' permission and ordered not to tell his parents . . . ."

(Defs.' Mem. at 36.) As the Court has already pointed out, Matthew's testimony under oath provides adequate support to create an issue of fact.

Defendants also argue that "Plaintiffs have cited no case – and we are aware of none – in which a court has found actions of a school district to rise to the level of a substantive due process outside the reproductive rights context." (Defs.' Mem. at 36.) It is accurate that *Jackson v. Peekskill City School Dist.*, 106 F. Supp. 3d 420 (S.D.N.Y. 2015), involved allegations by the parents of a minor child that without their consent, a school counselor removed their minor from a class and secretly transported her between school and a health clinic for the purpose of assisting her with birth control. In holding that the allegations stated a substantive due process claim for interference in the parent-child relationship, that court relied upon both the counselor providing the child with the means to access birth control and that the child "was obliged to be at school – and while plaintiffs believed she was receiving instruction . . . she was allegedly aided in accessing healthcare services." Here, there is evidence that while Michael and Sandra believed that Matthew was receiving instruction in his enrolled classes, Matthew was being forced to perform computer work for the District. This alleged manipulative and coercive conduct is adequate to support a Substantive Due Process claim.

Finally, Matthew testimony that he was ordered not to tell his parents about his work is sufficient to permit a reasonable trier of fact to conclude that the District engaged in actions "specifically intended to interfere with the family

relationship" as opposed to an "indirect and incidental consequence of their conduct." *Gorman v. Rensselaer County*, 910 F.3d 40, 48 (2d Cir. 2018).

On the grounds presented, summary judgment on Parents' Substantive Due Process claim is not warranted.

## VIII.  The Remaining Claims

Plaintiff does not oppose Defendants' motion seeking dismissal of his §1983 false arrest claim or his state law claims for slander per se and false arrest. Accordingly, Defendants' motion is granted as to these causes of action.

## CONCLUSION

For the reasons set forth above, the motion for summary judgment is granted with respect to Matthew's §1983 false arrest claim and his state law claims for slander per se and false arrest, but otherwise denied.

**SO ORDERED.**

Dated: Central Islip, New York             s/ Denis R. Hurley
      January 17, 2020                    Denis R. Hurley
                                             United States District Judge